**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ROBERT DAVID AGEE, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:14-01883** |
| | ) | **Judge Trauger/Brown** |
| **CAROLYN W. COLVIN,** | ) | |
| **ACTING COMMISSIONER** | ) | |
| **OF SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**To: The Honorable Aleta A. Trauger, United States District Judge.**

## REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration (SSA) through its Commissioner, denying plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i) and 423(d). For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 13) be **DENIED** and the Commissioner's decision **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff filed protectively for DIB on May 9, 2011. (Doc. 11, pp. 46, 102)[1] Plaintiff alleged an initial disability onset date of March 18, 2010. (Doc. 11, pp. 93, 102) Plaintiff claimed he was unable to work because of back surgery, a broken neck, back and ribs. (Doc. 11, pp. 49, 56, 105) Plaintiff's application was denied initially on August 30, 2011, and upon reconsideration on November 22, 2011. (Doc. 11, pp. 46, 47, 50-52, 54-55) On January 18, 2012, plaintiff requested

---

[1] References to page numbers in the Administrative Record (Doc. 11) are to the page numbers that appear in bold in the lower right corner of each page.

a hearing before an administrative law judge (ALJ). (Doc. 11, p. 57) A hearing was held in Nashville on April 1, 2013 before ALJ Michelle Thompson. (Doc. 11, pp. 28-45) Vocational Expert (VE) Pedro Roman testified at the hearing. (Doc. 11, pp. 28-30, 39-43) Plaintiff was represented at the hearing by attorney Chris George. (Doc. 11, pp. 28, 30-35, 43-44)

The ALJ entered an unfavorable decision on May 17, 2013. (Doc. 11, pp. 8-27) Plaintiff filed a request with the Appeals Council on June 4, 2013 to review the ALJ's decision. (Doc. 11, p. 7) The Appeals Council denied plaintiff's request on July 28, 2014, whereupon the ALJ's decision became the final decision of the Commissioner. (Doc. 11, pp. 1-6)

Plaintiff brought this action through counsel on September 18, 2014. (Doc. 1) Plaintiff filed a motion for judgment on the administrative record on December 29, 2014 (Doc. 13), the Commissioner responded on January 26, 2015 (Doc. 15), and plaintiff replied on January 27, 2015 (Doc. 16). This matter is now properly before the court.

## I. REVIEW OF THE RECORD

### A. Medical Evidence

Plaintiff was in a motorcycle accident on March 18, 2010, and taken by ambulance to the Vanderbilt University Medical Center (Vanderbilt). (Doc. 11, pp. 177-83) X-rays revealed an avulsion fracture[2] of the left occipital condyle,[3] a fracture of the left C7 lamina,[4] fractures of the left eighth through tenth ribs and right seventh through ninth ribs, a "T9 three column fracture, three

---

[2] Avulsion fracture – "an indirect fracture caused by [the ripping or tearing away of] a ligament." *Dorland's Illustrated Medical Dictionary* 184, 740 (32 ed. 2012).

[3] Occipital condyle – "one of two oval processes [prominence of bone] on the lateral portions" of the "posterior part of the head." *Dorland's* at 402, 1310, 1517.

[4] Lamina – "either of the pair of broad plates of bone flaring out from . . . the vertebral arches and fusing together at the midline to complete the dorsal part of the arch and provide a base for the spinous process." *Dorland's* at 1000.

column T4 fracture, and three column T3 fracture." (Doc. 11, pp. 179-83) Dr. Kyle Weaver, M.D., performed a T7-11 posterior spinal fusion for the T9 fracture the following day. (Doc. 11, pp. 175-76) Imaging of plaintiff's thoracic spine on March 20, 2010 showed in relevant part that "[t]he vertebral bodies of the thoracic spine appear to be in normal anatomic alignment with no sign of subluxation.[5]" (Doc. 11, pp. 171-72) Imaging of the lumbar spine on March 20, 2010 showed that the vertebral bodies were "in normal anatomic alignment with no sign of fracture or subluxation . . . [and] . . . mild degenerative changes . . . at the L5-S1 level." (Doc. 11, pp. 171-72) Plaintiff was discharged to home on March 24, 2010. (Doc. 11, pp. 165-67)

Dr. Weaver treated plaintiff post-operatively on May 12, June 9 and September 10, 2010 (Doc. 11, pp. 158-64), and on March 11, 2011 (Doc. 11, pp. 156-57). Dr. Weaver reported on May 12th that – neurologically – plaintiff's strength was "5/5 in all four extremities," there was no "pronator drift,"[6] his sensation was "grossly intact to light touch," his "reflexes [we]re symmetric," and his gait was "unremarkable." (Doc. 11, p. 162) Imaging of plaintiff's cervicothorasic spine was unremarkable, and Dr. Weaver reported that he "is making a wonderful recovery." (Doc. 11, pp. 162-64)

On June 9th, Dr. Weaver reported that plaintiff "reports experiencing intermittent back stiffness," but "[h]e continues to do well." (Doc. 11, p. 160) Dr. Weaver's clinical observations were the same as on May 12th, as was his assessment of the June 9th imaging. (Doc. 11, pp. 160-61)

Dr. Weaver reported on September 10th that plaintiff's "post-operative clinical course ha[d] been unremarkable" since his last visit, adding that plaintiff "reports experiencing persistent but

---

[5]  Subluxation – "an incomplete or partial . . . vertebral displacement believed to impair nerve function." *Dorland's* at 1791.

[6]  Pronator drift – pronator ~ "a muscle that serves to place in a prone position"; drift ~ "slow movement away from the normal or original position." *Dorland's* at 567, 1526-27. Neurologically, positive pronator drift indicates upper motor neuron disorder.

manageable back pain." (Doc. 11, p. 158)  Dr. Weaver's clinical observations were the same as those on May 12th and June 9th, as was his assessment of the September 10th imaging.  (Doc. 11, pp. 258-59)

On March 11, 2011, Dr. Weaver reported that, although plaintiff reported "experiencing persistent back pain," his "post-operative clinical course has been unremarkable."  (Doc. 11, p. 156)  Dr. Weaver's clinical observations, including his assessment of the March 11th imaging,[7] were the same as May 12th, June 9th, and September 10th.  (Doc. 11, pp. 156-57)  Noting that plaintiff "[c]ontinues to do well," Dr. Weaver concluded: "We will see him back in clinic as needed."  (Doc. 11, p. 157)  The medical evidence of record shows that plaintiff did not return to see Dr. Weaver.

The hand-written clinical notes of Dr. Bradley Hill, D.O., the Pain Management Group, are before the court for the period June 16, 2010 to March 2, 2011.  (Doc. 11, pp. 187-222)  Plaintiff's chief complaint was mid-back pain[8] on each occasion during this period, with respect to which he reported the severity of his pain without medication as 8 to 9 on a scale of 0 to 10 on five occasions[9] during this 8 ½ month period, and 7 on four occasions.  (Doc. 11, pp. 187, 191, 195, 199, 203, 207, 211, 215, 219)  Plaintiff reported pain with medication during the same period as 2 to 3 on one occasion, and 2 or less on eight occasions.  (Doc. 11, pp. 187, 191, 195, 199, 203, 207, 211, 215, 219)  Plaintiff reported on each occasion that his pain was "better" since his last visit, that his pain was "improved" by sitting, and on each occasion Dr. Hill reported that plaintiff's gait and stance were normal.  (Doc. 11, pp. 187, 190, 191, 194-95, 198-99, 202-03, 206-07, 210-11, 214-15, 218-19, 222)

---

[7]  The actual imaging report also notes – for the first and only time – that there is "a background of significant osteopenia . . . ."  Osteopenia – "any decrease in bone mass below normal."  *Dorland's* at 1347.

[8]  Plaintiff's "chief complaint" throughout all of Dr. Hill's clinical notes was mid back pain.  There is nothing in Dr. Hill's clinical notes that shows plaintiff ever presented for either neck or low back pain.

[9]  On this scale, 0 is no pain and 10 is unbearable pain, the values in between representing varying degrees of lesser or greater pain.  Although not presented as such, numerical references hereafter to plaintiff's subjective claims of pain are based on this 0-10 scale.

Dr. Hill reported on July 14, 2010 that plaintiff's "pain [was] gradually improving." (Doc. 11, p. 216) On October 13, 2010, Dr. Hill checked the boxes corresponding to abnormalities of the thoracic spine, but did not elaborate. (Doc. 11, p. 206) Plaintiff reported on eight occasions during this period that medication helped him to sleep better, on every occasion that medication enabled him to be more active and do house chores, and on three of the last four visits that medication helped him work part time. (Doc. 11, pp. 187, 191, 195, 199, 203, 207, 211, 215, 219) Plaintiff also represented on four occasions that his medication had no side effects. (Doc. 11, pp. 187, 191, 203, 219)

Dr. Hill's typed clinical note dated May 11, 2011 reports that plaintiff's pain was 8 without medications, 3 with medications, that medication helped him to sleep better and be more active, that his pain was relieved by sitting, and that his medication caused no side effects. (Doc. 11, p. 229) Dr. Hill also reported that, although plaintiff's thoracic spine exhibited tenderness on palpation, he again was in "no acute distress," and his gait and stance were normal. (Doc. 11, pp. 229-30)

Plaintiff continued his treatment at the Pain Management Group on August 24 and November 16, 2011. (Doc. 11, pp. 243-46, 269-72) Plaintiff represented during those visits that his pain without medication was 9 and 8 respectively, and 3 and 2 with medication.[10] Doc. 11, pp. 243, 269) Plaintiff reported on both occasions that his pain was "relieved" by sitting, and on November 16th, that his medication caused no side effects. Both clinical notes reflect that medication permitted plaintiff to sleep better, be more active, and do house chores. (Doc. 11, pp. 243, 269) Plaintiff represented on November 16th that physical therapy, spinal injections, surgery, home exercises, and trigger point injections "helped." (Doc. 11, p. 269) These two clinical notes again record that,

_____

[10] On August 24th, Dr. Hill reported that plaintiff's pain was "[u]nchanged by medication." Dr. Hill reported in the same line of text that plaintiff's pain without medication was 9, but with medication was 3. (Doc. 11, p. 243) Both notations as to the effect of plaintiff's pain with medication cannot be true. This is the first of many such future inconsistencies in Dr. Hill's clinical notes pertaining to plaintiff's pain. (Doc. 11, pp. 243, 250, 354, 258, 260, 263, 266, 311, 315, 319, 327)

although plaintiff's back exhibited tenderness on palpation of the thoracic region, he was in no acute distress, and his gait and stance were normal. (Doc. 11, pp. 244, 271) The November 16th clinical note showed that plaintiff's lower back exhibited no tenderness on palpation, no low-back spasms, straight leg raises of both legs were negative and – neurologically – that his strength was 5/5 in all muscles, he was able to walk on his toes and heels, and he was able to rise from a squat without using his hands. (Doc. 11, p. 271) Dr. Hill diagnosed plaintiff on November 16th with cervical disc degeneration, thoracic back pain, and lumbar spondylosis,[11] a diagnosis carried forward in Dr. Hill's subsequent clinical notes. (Doc. 11, pp. 252, 256, 262, 265, 268, 272, 313, 317, 321, 325, 329, 333)

Plaintiff continued his treatment at the Pain Management Group from February 8, 2012 to September 14, 2012. (Doc. 11, pp. 250-68) Plaintiff represented on February 8th and April 4th that his pain was "relieved" by sitting, but for the first time on May 30th that his pain was "worse" with sitting. (Doc. 11, pp. 260, 263, 266) Plaintiff also represented on February 8th, April 4th, and May 30th that his pain was between 9 and 10 without medication, 2 with medication, that medication allowed him to sleep better, be more active, do house chores, and that his medications caused no side effects. (Doc. 11, pp. 260, 263, 266) Although each clinical note indicted that plaintiff's thoracic spine exhibited tenderness bilaterally on palpation of the thoracic region, each note reported that plaintiff's cervical spine "exhibited lordosis[12] within normal range," that plaintiff was in no acute distress, and that his gate and stance were normal. (Doc. 11, pp. 261, 264, 267) Each clinical note reported further that plaintiff's lower back exhibited no tenderness on palpation, no low-back spasms, that straight leg raises of both legs were negative, and – neurologically – on February 8th that his strength was 5/5 in all muscles, he was able to walk on his toes and heels, and he was able to rise

---

[11] Lumbar spondylosis – "degenerative joint disease affecting the lumbar vertebrae and intervertebral disks . . . ." *Dorland's* at 1754.

[12] Lordosis – the "concave portion of the vertebral column as seen from the side . . . ." *Dorland's* at 1074.

from a squat without using his hands.  (Doc. 11, pp. 262, 265, 268)

The pain information from Dr. Hill's August 15th and September 14th clinical notes cannot be determined from the record before the court because there are multiple entries for pain on the same date, all of which conflict/vary widely within the same clinical note.[13]  (Doc. 11, pp. 250, 254)  These clinical notes continue to show, however, that plaintiff's medication allowed him to sleep better, be more active, and do household chores and, on September 14th, that plaintiff was "having to do more activity since his son . . . went off to college."   (Doc. 11, pp. 250, 254)  Although each clinical note reported that plaintiff's back exhibited tenderness bilaterally on palpation of the thoracic region, each reported again that plaintiff was in no acute distress, and his gate and stance were normal.  (Doc. 11, pp. 251, 255)  Each note also reports that plaintiff's lower back exhibited no tenderness on palpation, no low-back spasms, that straight leg raises of both legs were negative, and – neurologically – his strength was 5/5 in all muscles, he was able to walk on his toes and heels, he was able to rise from a squat without using his hands, and his cervical spine "exhibited lordosis within normal range." (Doc. 11, pp. 251-52, 256)

Plaintiff underwent a MRI of the thoracic spine at Premier Radiology on September 14, 2012 ("the MRI").  (Doc. 11, pp. 273, 335)  The impressions from the MRI are as follows:

> 1.  There is a chronic[14] anterior compression fracture of the T3 vertebral body with approximately 75% height loss anteriorly.  There

---

[13]   The following pain-related entries appear the **August 15th record**: "Without medications, pain is 8/10 • Without medications, pain is 9/10 • Without medications, pain is 10/10 • With medications, pain is 3/10 • With medications, pain is 4/10 • With medications, pain is 5/10 • With medications, pain is 6/10 • With medications, pain is 7/10 • With medications, pain is 8/10 • With medications, pain is 9/10."  (Doc. 11, p. 254)  The following pain-related entries appear the **September 14th record**: "Without medications, pain is 8/10 • Without medications, pain is 9/10 • Without medications, pain is 10/10 • With medications, pain is 4/10 • With medications, pain is 5/10 • With medications, pain is 6/10 • With medications, pain is 7/10 • With medications, pain is 8/10 • With medications, pain is 9/10."  (Doc. 11, p. 254)  Analysis of the medical evidence of record reveals that these conflicting with-and-without pain levels do not represent a chronological summary of plaintiff's previous claims of pain.

[14]   Chronic – "persisting over a long period of time."  *Dorland's* at 359.

is a chronic anterior compression fracture of the T4 vertebral body with approximately 75% height loss anteriorly. There is a focal kyphosis[15] at T3-T4 with anterolisthesis[16] of T2 on T3. There is increased T2 signal within the T3-T4 disc which is likely degenerative in nature.

2. There is a chronic compression fracture through the central aspect of the T9 vertebral body. There is increased T2 signal within the T8-T9 and T9-T10 disc with persistent high intensity signal extending through the central aspect of the T9 vertebral body. There has been a prior posterior fusion which extends from T7 through T11. Susceptibility artifacts limit evaluation of these levels.

3. At T2-T3 there is anterolisthesis producing minimal spinal canal and minimal bilateral neuroforaminal stenosis.[17]

4. At T9, there is minimal retropulsion[18] with no significant spinal canal stenosis.

5. Examination of the remaining thoracic intervertebral discs demonstrates no disc herniation, spinal canal stenosis, or neuroforaminal stenosis.

(Doc. 11, pp. 273, 335)

The final clinical notes attributable to Dr. Hill are for the period October 10, 2012 through March 6, 2013. (Doc. 11, pp. 311-37) The clinical notes for October 10, November 7, December 5, 2012, February 6 and March 6, 2013 again contain conflicting pain information similar to that discussed above at p. 7 and n. 13. (Doc. 11, pp. 311, 315, 323, 327, 331) The January 9, 2013

---

[15] Kyphosis – "abnormally increased convexity in the curvature of the thoracic vertebral column as viewed from the side." *Dorland's* at 992.

[16] Anterolisthesis – "forward displacement . . . of one vertebra over another . . . ." *Dorland's* at pp. 98, 1754.

[17] Neuroforaminal stenosis – Neuro ~ "denoting relationship to a nerve or nerves, or to the nervous system"; foramen ~ "a natural opening or passage, especially . . . into or through a bone"; stenosis – "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space . . . ." *Dorland's* at 729, 1263, 1770.

[18] Retropulsion – "an abnormal gait in which the body is bent backward." *Dorland's* at 1636.

clinical note is the only note where there is no conflict. In that note, plaintiff represents that his pain is 9 both with and without medication. (Doc. 11, p. 319) All but the March 6, 2013 contain internal conflicts on the effect of sitting on plaintiff's pain. The March 6th note reports that the pain is worse with sitting. (Doc. 11, p. 311) The other notes state in the same sentence that the pain is both worse with sitting and relieved by sitting. (Doc. 11, pp. 315, 319, 323, 327, 331) Each of these notes in this period report that medication allows plaintiff to sleep better and be more active, and all but the November 7th note reports that medication permits him to do house chores. (Doc. 11, pp. 311, 315, 319, 323, 327, 331) None of these nearly-five-months of clinical notes in this period makes reference to any examination of plaintiff's cervical paraspinal region, or observations related thereto. All of these notes report further that plaintiff is in no acute distress, and that his gait and stance were normal. (Doc. 11, 312-13, 316-17, 320, 324, 328, 332) These clinical notes also repeat the prior observations that: the cervical spine exhibited lordosis within normal range (Doc. 11, pp. 328, 332); the lower back exhibited no tenderness on palpation, no evidence of spasms, and that straight-leg raises were negative left and right (Doc. 11, pp. 317, 320, 324, 329, 332-33); neurologically plaintiff's strength was 5/5 in all muscles, he able to walk on his toes and heels, and he was able to rise from a squat without using his hands (Doc. 11, pp. 329, 333). Dr. Hill reported for the first time on March 6th that plaintiff exhibited an "antalgic gait."[19] (Doc. 11, p. 313) Dr. Hill also added "compression fracture of thoracic vertebral body T3, T4 & T9" to his previous diagnoses, an added diagnosis that carries forward through to the end of his clinical notes. (Doc. 11, pp. 313, 317, 321, 325, 329, 333)

Dr. Hill completed two medical source statements on March 7, 2013. (Doc. 11, pp. 305-10)

_____

[19] Antalgic – "counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain." *Dorland's* at 97.

In one, Dr. Hill opined in relevant part that plaintiff: 1) could not reliably work an 8-hr. workday, 40-hr. work week, without missing more than 2 days per month; 2) could not sit for more than 4 hrs. total in an 8-hr. workday, or more than 15-30 mins. at a time; 3) could not stand more than 1-2 hrs. total in an 8-hr. workday, or more than 15-30 mins. at a time; 4) could not walk for more than 1-2 hrs. total in an 8-hr. workday, or for more than 15-30 mins. at a time; 5) could lift up to 10 lbs frequently, and up to 20 lbs occasionally; 6) could use his hands for gross and fine manipulation continuously, but could only bend occasionally, and never push or pull; 7) experienced "severe" pain from his condition; 8) needed to lie down due to pain 2-4 hrs. per day, 7 days per week; 9) needed to take unscheduled breaks to rest approximately every 30 mins.; 10) needed to rest "maybe" 1-2 hrs. before returning to work, but usually only 15-30 mins.; 11) had limitations pertaining to heights, vibrations, and machinery.  (Doc. 11 pp. 305-06)

In the second medical source statement, Dr. Hill opined that: 1) plaintiff's "stamina and endurance significantly affect[s] . . . the extent that he . . . will experience difficulty working continuously 8 hours per day without several intermittent periods of rest, each exceeding 15 minutes," that he will "need to lie down intermittently during the during the course of an 8-hour workday" due to his condition, and that he will "need to alternate standing and sitting during the course of an 8-hour workday"; 2) it was reasonable that plaintiff's conditions would result in "significant variations in his . . . ability to sustain a consistent of functioning from day to day," and that plaintiff's condition would "result in absences from work at a rate exceeding 2 days per month"; 3) plaintiff could carry up to 10 lbs. frequently and 20 lbs. occasionally; 4) plaintiff could walk 1-2 hrs. in an 8-hr. workday, but 0 hrs. without interruption; 5) plaintiff's condition is affected by sitting, limiting him to a total of 4 hrs in an 8-hr. workday, but 0 hrs. without interruption; 6) plaintiff's endurance is affected by his condition, *i.e.*, "spinal fusion and damage to nerves have caused

weakness in his legs with exertion"; 7) plaintiff must rest 5 hrs. in an 8-hr. workday; 8) plaintiff can kneel and bend occasionally, but never climb, balance, stoop, crouch, or crawl; 9) plaintiff has reaching, handling, and pulling physical limitations, but no other postural limitations; 10) plaintiff has environmental limitations pertaining to heights, moving machinery, and vibration, but no others. (Doc. 11, pp. 307-10)

## B. Hearing[20]

Plaintiff testified upon questioning by the ALJ that he had been in a motorcycle accident in 2010, after which the "[v]ertebrae in [his] back w[ere] caged in . . . with two steel bars and a bunch of screws." (Doc. 11, p. 33) He testified further that, since then, he has been unable "to do anything for any extended period of time without rest . . . ." (Doc. 11, p. 33)

Plaintiff testified that he experienced pain "right up under [his] shoulder blades all the way across [his] back." (Doc. 11, p. 33) He added that using his "arms or hands . . . if they're not . . . resting on something" made his pain worse, as did sitting, standing, or walking. (Doc. 11, p. 34) Lying down or reclining in a chair was the only way he could relieve the pain and, "depending on [his] activity," he had to do so "two or three times a day . . . ." (Doc. 11, p. 34)

When the ALJ asked plaintiff to clarify what he meant by "depending on my activity," plaintiff testified: "If I'm working out in the yard or out in the garage, just piddling around . . . it's more than two or three times a day. I can't go very long before I have to take a break and get some relief on my back." (Doc. 11, p. 34) When the ALJ asked plaintiff to clarify how long he could "piddle around . . . before [he] need[ed] to take a break," plaintiff replied: "Most of the time up to about an hour," after which he would have to lie down/recline "[n]ormally 15 minutes maybe, 20

---

[20] The excerpts of the hearing transcript addressed below are those necessary to support the court's analysis of plaintiff's claims of error. The remainder of the transcript of the hearing is incorporated herein by reference.

minutes, depending . . . on the activity." (Doc. 11, p. 34)

Plaintiff also testified as follows in response to the ALJ's question: "What do you do during the day?"

> Anything I can do . . . . I do try to get out and do as much as I can to stay active. Maybe small house chores, go out and piddle in the garage. When my son went off to college last year, then we have to mow the yard in the summertime. Not a whole lot I can do as far as an extended time . . . . But I do try to stay as active as I can. We . . . live on seven acres. . . .

(Doc. 11, p. 36) Plaintiff clarified that he did not mow all seven acres. He then provided the following answer to the ALJ's question: "[C]an you give me examples of what you do when you say piddling in the garage?":

> I've been a handyman all my life. Had a friend come over one time with a tailgate on a trailer. It just needed spot welding in a couple places to fix his trailer. That kind of piddling. Handyman type stuff. More trying to clean the garage up where I can walk through it.

(Doc. 11, p. 36) Plaintiff testified that he was able to drive. (Doc. 11, p. 36)

## C. The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if he can show his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process to determine whether an individual is "disabled" within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374-75 (6th Cir. 2014). While the claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner at step five to identify a significant number of jobs in the economy that accommodate the claimant's

residual functional capacity (RFC) and vocational profile. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

## III. ANALYSIS

### A. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record, and whether the decision was made pursuant to proper legal standards. 42 U.S.C. § 405(g); *Gayheart*, 710 F.3d at 374. Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see Gentry v. Comm's or Soc. Sec'y*, 741 F.3d 708, 722 (6th Cir. 2003). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different conclusion. *Gayheart*, 710 F.3d at 374. "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006).

### B. Claims of Error

#### 1. Whether the ALJ Evaluated Medical Opinion Evidence in Accordance with Sixth Circuit Precedent and SSA Regulations (Doc. 14, pp. 3-11)

The crux of plaintiff's first argument is that the ALJ failed to give controlling weight to Dr. Hill's opinion. Plaintiff's argument is summed up in the following excerpt from his supporting memorandum:

> **[T]he ALJ gave** the greatest weight to the opinion of nontreating, nonexamining sources with the least knowledge of [plaintiff's] condition, significant weight to the opinion of a nonacceptable

13

medical source (a chiropractor) that examined [plaintiff] on only one occasion, and **the least weight to the opinion of a source who supervised [plaintiff's] treatment since mid-2010 and who was a specialist in treating chronic pain.**

(Doc. 14, pp. 8-9)(emphasis added)

Under the standard commonly called the "treating physician rule," the ALJ is required to give a treating source's opinion "controlling weight" if two conditions are met: 1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; 2) the opinion "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R. § 404.1527(c)(2)). However, the ALJ "is not bound by a treating physician's opinions, especially when there is substantial medical evidence to the contrary." *Cutlip v. Sec'y of Health and Human Serv's*, 25 F.3d 284, 287 (6th Cir. 1994). If the Commissioner does not give a treating-source opinion controlling weight, then the Commissioner is required to provide "good reasons" for discounting the weight given. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting SSR 96–2p, 1996 WL 374188 at *5 (SSA)).

The ALJ wrote the following summary of her reasons for giving Dr. Hill's opinions "little" weight rather than controlling weight normally due a treating source:

> Dr. Hill's medical source statements . . . are not consistent with the unremarkable physical examinations, the consultive examination at Exhibit 3F, the claimant's reports of only mild pain and improved functionality with medication, and his reported activities.

(Doc. 11, p. 21) Although the ALJ did not address Dr. Hill's reliance on the MRI in the summary explanation above, she did address Dr. Hill's opinion *vis-a-vis* the MRI elsewhere in her opinion:

The claimant did not endorse and increase in his pain until August 2012, but the following month he mentioned that his activity level had increased since his son left for college, indicating the increase in his pain did not significantly affect his abilities. Furthermore, even with his reportedly increased pain and the September 2012 MRI findings, the claimant's physical examinations remained unchanged through February 2013 with findings of normal gait, negative straight leg raises, normal muscle strength, and no lumbar tenderness o[r] spasm.

(Doc. 11, p. 20) The foregoing taken together constitute good reasons for rejecting Dr. Hill's opinions.

The next question is whether the ALJ's decision to give Dr. Hill's opinions little weight is supported by substantial evidence. Since Dr. Hill's medical opinions expressed in the medical source statements are grounded in his four diagnoses, analysis of those diagnoses is key to determining whether substantial evidence supports the ALJ's decision to give his opinions little weight.

### a. Cervical Disc Degeneration

The only objective medical evidence pertaining to cervical disc degeneration is the imaging of plaintiff's cervical spine performed at Vanderbilt. The MRI addresses only plaintiff's thoracic spine. Therefore, it has no bearing this inquiry.

The relevant portions of the May 12, 2010 Vanderbilt radiology report of plaintiff's cervical spine following his surgery reads as follows: "There is no new fracture. There is no malalignment or subluxation. There is no abnormal motion with flexion and extension. The prevertebral and predental soft tissues are normal." (Doc. 11, p. 163) The subsequent June 9, 2010 Vanderbilt radiology report of plaintiff's cervical spine reads as follows: "Lateral radiographs are obtained in flexion and extension. The vertebral body height and alignment are normal. There is no abnormal motion on the flexion and extension radiographs." (Doc. 11, p. 161) Dr. Weaver reported repeatedly in his assessment of this imaging that there was "no change in alignment or abnormal motion" of plaintiff's "cervicothoracic spine." (Doc. 11, pp. 157, 159-60, 162) In short, there is nothing in the

Vanderbilt records that supports Dr. Hill's diagnosis that plaintiff suffered from cervical disc degeneration.

Dr. Hill's own clinical notes are, of course, relevant to this inquiry. In his initial handwritten clinical notes, however, apart from repeatedly listing plaintiff's spinal injuries and surgical repairs, Dr. Hill never once attributed any abnormalities to plaintiff's cervical spine in the section of those notes where he was called upon to do so. (Doc. 11, pp. 190, 194, 198, 202, 206, 210, 214, 218, 222) Although Dr. Hill's later typed clinical notes listed cervical disc degeneration repeatedly as an "active problem" (Doc. 11, pp. 251, 254, 260, 263, 266, 269, 312, 323, 327, 331), and although he diagnosed plaintiff repeatedly with cervical disc degeneration (Doc. 11, pp. 252, 256, 259, 262, 265, 268, 272, 317), Dr. Hill's numerous musculoskeletal examinations revealed only that "[t]he cervical spine exhibited lordosis within normal range." (Doc. 11, pp. 251, 255, 261, 264, 267, 271, 328, 332) Dr. Hill recorded nothing else in his clinical notes pertaining to plaintiff's cervical spine, negative or otherwise. Moreover, as previously discussed above at p. 4 n. 8, Dr. Hill's clinical notes do not show that plaintiff ever even presented for neck pain – his chief complaint always was mid-back pain. In short, Dr. Hill's clinical notes do not support his diagnosis that plaintiff suffered from cervical disc degeneration, much less that cervical disc degeneration resulted in/contributed to the intensity, persistence, and limiting effect of the pain alleged.

### b. Compression Fractures of Thoracic Vertebral body T3, T4 and T9 and Thoracic Back Pain

As previously discussed above at pp. 2-4, the Vanderbilt imaging catalogued plaintiff's thoracic spine injuries, and described both the nature and status of the surgical repairs made to those injuries. Although those injuries and/or surgical repairs could reasonably be expected to have caused plaintiff's alleged symptoms, there is nothing in the Vanderbilt imaging that supports plaintiff's claims as to the intensity, persistence and limiting effects of those injuries/surgical repairs. Dr.

Weaver's consistently positive post-operative clinical notes during the year that followed plaintiff's surgery, including his repeated reference to the unremarkable imaging during that period, indicate otherwise. Indeed, although plaintiff reported "persistent back pain" when Dr. Weaver treated him for the last time on March 11, 2011, Dr. Weaver reported that plaintiff "continues to do well." (Doc. 11, pp. 156-57) As previously discussed above at p. 4, Dr. Weaver also wrote that he would "see [plaintiff] back in clinic as needed." Plaintiff never returned, the inference being that his symptoms were not so severe that he felt he needed to see his surgeon again.

As for the MRI, the catalog of injuries and surgical repairs described in the "FINDINGS" and "IMPRESSION" sections of the report could, once again, be reasonably expected to give rise to plaintiff's alleged symptoms. However, as discussed below, there is nothing in the MRI report that supports plaintiff's claims of intensity, persistence and limiting effects of those symptoms.

The MRI reports that the T3, T4, and T9 compression fractures were "chronic," *i.e.*, they had "persist[ed] over a long period of time." The compression fractures at T3 and T4 were observed when plaintiff was hospitalized at Vanderbilt (Doc. 11, p. 158), and T9 was stabilized by fusing T7 through T11 (Doc. 11, pp. 175-76). Assuming for the sake of discussion that these compression fractions caused back pain, the MRI report characterizes plaintiff's thoracic spine as follows: "minimal spinal canal and minimal bilateral neuroforaminal stenosis" at T2-T3; "minimal retropulsion with no significant spinal canal stenosis" at T9; examination of "the remaining thoracic intervertebral discs demonstrates no disc herniation, spinal canal stenosis, or neuroforaminal stenosis." In other words, although these compression fractures may have caused localized mid-back pain, the pain would not have radiated "across" plaintiff's body as he testified at the hearing.

The next question is whether Dr. Hill's clinical notes support the intensity, persistence, and limiting effects of plaintiff's alleged pain reflected in the two medical source statements. Dr. Hill's

handwritten clinical notes discussed above at p. 5 made only a single reference to any thoracic abnormality in the 8 ½ months covered by those notes. However, Dr. Hill did not elaborate on the abnormality – he merely checked three boxes that indicated plaintiff's thoracic spine was abnormal. (Doc. 11, p. 206) Dr. Hill's subsequent typed clinical notes over the next two-plus years did, however, make repeated reference to tenderness bilaterally on palpation of the thoracic paraspinal region, and spasms of the thoracic paraspinal muscles bilaterally. (Doc. 11, pp. 230, 244, 255-56, 261, 264, 267, 271, ) That said, the bulk of those clinical notes also record the following based on plaintiff's own subjective representations: his pain was mild with medication; medication helped him sleep better, be more active, do house chores, and work part time; his medication had no side effects; sitting relieved his pain; and, at least during the first 8 ½ months, his pain improved from visit to visit. It is worthy to note that plaintiff did not represent until nearly two years after Dr. Hill began treating him that his pain was made worse by sitting, and then not until after his claim for benefits had been denied upon reconsideration. Dr. Hill's clinical notes also never report that plaintiff presented in acute distress, or that his gait and stance were anything but normal – at least not until one month before the hearing at which time Dr. Hill reported for the first and only time that plaintiff presented with an antalgic gait. Finally, it cannot go without being said that, apart from the MRI on which he based his medical source statements, Dr. Hill's two-plus years of clinical records are based solely on plaintiff's subjective complaints.

Next, there is plaintiff's testimony at the hearing. As discussed above at pp. 11-12, plaintiff testified that he worked in his yard, which included mowing at least part of 7 acres, "piddled" in the garage, which included cleaning it, and did "[h]andyman type stuff," an example of which was welding the tailgate on a friend's trailer. Plaintiff's also testified that he had to do more when his son went to college, testimony that was consistent with the September 14, 2012 clinical note in which Dr.

Hill reported, as discussed above at p. 7.

As shown above, the evidence before the court does not support the intensity, persistence and limiting effects that Dr. Hill attributed to plaintiff's diagnosed conditions in the two medical source statements.

### c. Lumbar Spondylosis

The Vanderbilt clinical notes for March 18, 2010 – the day of the accident – reflect the following based on plaintiff's subjective complaint: "Notable for severe low back pain." (Doc. 11, p. 182) Two days later, on March 20, 2010, imaging of plaintiff's lumbar spine showed the following: "The vertebral bodies of the lumbar spine are in normal anatomic alignment with no sign of fracture of subluxation. There are mild degenerative changes seen at the L5-S1 level." (Doc. 11, pp. 171-72). Apart from the unremarkable imaging report on March 20, 2010, there is no other objective medical evidence in the record that pertains to plaintiff's lumbar spine. (As previously discussed, the MRI was of plaintiff's thoracic spine.) "Mild" changes such as that reported do not support the intensity, persistence and limiting effects reflected in Dr. Hill's two medical source statements.

Dr. Hill's clinical notes once again are relevant to this inquiry. Although Dr. Hill repeatedly diagnosed plaintiff with lumbar spondylosis (Doc. 11, pp. 252, 256, 259, 262, 265, 268, 272, 313, 317, 321, 325, 329), he also reported repeatedly that plaintiff's lumbar spine exhibited no tenderness on palpation of the paraspinal muscles, no evidence of spasms of the paraspinal muscles, and straight-leg raises were negative left and right (Doc. 11, pp. 251, 256, 262, 265, 268, 271, 317, 320, 324, 329, 332-33). Dr. Hill's clinical records also are remarkable for the fact that not once does he record a negative observation upon examination of plaintiff's lumbar spine, nor does plaintiff ever present with low-back pain as the chief complaint. As previously discussed, plaintiff's chief complaint

always was mid-back pain.

### d. Conclusion

As shown above, the ALJ gave "good reason" for giving Dr. Hill's opinions little weight, and those reasons are supported by substantial evidence. Accordingly, plaintiff's first claim of error is without merit.

### 2. Whether the ALJ's Determination That Plaintiff Could Perform Jobs Identified by the VE is Supported by Substantial Evidence (Doc. 14, p. 11)

Plaintiff's second argument derives from the first, *i.e.*, that the ALJ erred in not giving Dr. Hill's opinions controlling weight. Specifically, plaintiff asserts that:

> [T]he ALJ should have afforded greatest, if not controlling, weight to Dr. Hill's opinion. In her second hypothetical, the ALJ included only some of the exertional limitations assessed by Dr. Hill, and the VE testified these precluded work (Tr. 42-43). <u>Non-exertional limitations assessed by Dr. Hill (need for excessive breaks, need to lie down, and excessive absenteeism) also precluded work, according to the VE</u> (Tr. 43).

(Doc. 14, p. 11)(underline added)

The record shows that the text underlined above relates to counsel's question to the VE in the context of the ALJ's second hypothetical, in response to which the VE did, in fact, testify that the additional limitations proffered by counsel "also precluded work." However, given that the VE already had testified that the limitations presented by the ALJ in the second hypothetical would have precluded work, the Magistrate Judge is at a loss to understand how counsel's proffer of additional limitations that "also precluded work" gives rise to error, reversible or otherwise. In other words, if the result would have been the same, *i.e.*, plaintiff would have been unable to work, there is no prejudice. Plaintiff's second claim of error is without merit.

### IV. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 13) be **DENIED** and the Commissioner's decision **AFFIRMED**. The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, 142, *reh'g denied*, 474 U.S. 111 (1986); *Alspaugh v. McConnell*, 643 F.3d 162, 166 (6th Cir. 2011).

        **ENTERED** this 13th day of January, 2016.


                        /s/ Joe B. Brown
                        Joe B. Brown
                        United States Magistrate Judge